UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
USVALDO CONTRERA et al.,                          :

                                                  :

                        Plaintiffs,               :      <u>OPINION AND ORDER</u>

              -v.-                                 :

                                                  :      16 Civ. 3851 (LTS) (GWG)

IRVING LANGER et al.,                             :

                        Defendants.               :
----------------------------------------------------------------x
GABRIEL W. GORENSTEIN, United States Magistrate Judge

 Plaintiffs Usvaldo Contrera, Francisco Lopez, Pedro Batista, Fabian Herrera, and

Antonio Reyes — superintendents, handymen, and a porter at residential buildings in Upper

Manhattan and the Bronx — filed this action against their purported employers: individuals,

investment entities, management entities, and title-holding entities that plaintiffs collectively

refer to as "the E&M Enterprise."  Plaintiffs move to have this case conditionally approved as a

collective action under the Fair Labor Standards Act, 29 U.S.C. § 201 <u>et. seq.</u> ("FLSA"), with

notice being sent to "all of Defendants' current and former superintendents, porters, and

handymen."[1]  For the following reasons, plaintiffs' motion is granted in part and denied in part.

---

[1]  <u>See</u> Notice of Motion, filed Mar. 7, 2017 (Docket # 104); Declaration of Usvaldo
Contrera, filed Mar. 7, 2017 (Docket # 105) ("Contrera Decl."); Declaration of Francisco Lopez,
filed Mar. 7, 2017 (Docket # 106) ("Lopez Decl."); Declaration of Pedro Batista, filed Mar. 7,
2017 (Docket # 107) ("Batista Decl."); Declaration of Fabian Herrera, filed Mar. 7, 2017
(Docket # 108) ("Hererra Decl."); Declaration of Antonio Reyes, filed Mar. 7, 2017 (Docket
# 109) ("Reyes Decl."); Declaration of Marc A. Rapaport, filed Mar. 7, 2017 (Docket # 110)
("Rapaport Decl."); Memorandum of Law in Support of Plaintiffs' Motion to Conditionally
Certify Fair Labor Standards Act Collective Action and Authorize that Notice be Issued to All
Persons Similarly Situated, filed Mar. 7, 2017 (Docket # 111) ("Pls. Mem."); Opposition
Declaration of Scott Katz, filed Apr. 24, 2017 (Docket # 116); Opposition Declaration of Larry
R. Martinez, filed Apr. 24, 2017 (Docket # 117); Defendants' Memorandum of Law in
Opposition to Plaintiffs' Motion to Conditionally Certify Fair Labor Standards Act Collective
and Authorize that Notice be Issued to All Persons Similarly Situated, filed Apr. 24, 2017

I. <u>BACKGROUND</u>

    A. <u>Allegations in the Amended Complaint Regarding Wage and Hour Violations</u>

    The amended complaint alleges that plaintiffs were not paid minimum wage and overtime wage rates required by the FLSA.  <u>See</u> Amended Class Action Complaint, filed July 11, 2017 (Docket # 131) ("Am. Compl."), at ¶¶ 402-412.  More specifically, plaintiffs claim that superintendents employed by defendants had "to work an average of eighty (80) hours per week and to be on-call at all hours of the day and night," but that defendants "failed to pay Superintendents for any hours that they worked in excess of forty each week."  <u>Id.</u> ¶¶ 5, 24.  Plaintiffs claim that porters and handymen employed by defendants were also not paid for any hours they worked beyond 40, <u>id.</u> ¶ 25, alleging that defendants had a pattern of not paying for handymen's first and last half-hour of work, <u>id.</u> ¶ 7, and that porters worked an average of 70 hours per week without overtime compensation, <u>id.</u> ¶ 8.

    B. <u>Allegations in the Amended Complaint Regarding the Identity of Plaintiffs' Employer</u>

    Plaintiffs' amended complaint names four individuals and over 160 corporate entities as plaintiffs' employers.  The complaint alleges:

> Defendants were and still are a centrally managed real estate enterprise [a.k.a. the "E&M Enterprise"] that was founded by Defendant Irving Langer ("Langer") in or about 1979, and that, upon information and belief, owned, controlled, and managed more than 3,000 rental apartment units located in at least 262 apartment buildings situated primarily in lower-income neighborhoods in Bronx, Brooklyn, Queens, and Upper Manhattan. . . .  During the time period relevant . . . the E&M Enterprise was controlled by individual defendants Langer, Leibel Lederman

---

(Docket # 118) ("Defs. Mem."); Plaintiffs' Reply Memorandum of Law in Further Support of Motion to Conditionally Certify Fair Labor Standards Act Collective Action and Authorize that Notice be Issued to All Persons Similarly Situated, filed May 25, 2017 (Docket # 119) ("Pls. Reply"); Letter from Meredith R. Miller, Esq., dated Aug. 4, 2017 (Docket # 174) ("Miller Letter"); Letter from Christopher P. Hampton, Esq., dated Aug. 11, 2017 (Docket # 180) ("Hampton Letter").

("Lederman"), Aryeh Z. Ginzberg ("Ginzberg") and Meyer Brecher ("Brecher") . . . .

Id. ¶¶ 10, 12.  The complaint alleges that the "E&M Enterprise" had its principal place of business at 1465A Flatbush Avenue in Brooklyn, and maintained an office at 975 Walton Avenue in the Bronx.  Id. ¶ 13.  It alleges that Langer, Lederman, and Ginzberg owned and managed the Enterprise's apartment buildings through investment entities such as "Manhattanville Holdings LLC" and "SG2-E&M"; management companies, including E&M Bronx Associates LLC, E&M Associates LLC, Galil Management LLC, and Galil Realty LLC; and title-holding entities, usually named after the buildings to which they held the title (e.g. "638 West 160 Holdings LLC").  See id. ¶¶ 16, 97-110.

The amended complaint alleges that Langer, Lederman, Ginzberg, and Brecher "exercised sufficient control over the E&M Enterprise's operations to be considered Plaintiffs' employer[s] under the FLSA . . . ."  Id. ¶¶ 73, 83, 92, 96.  It further alleges that the corporate entities named as defendants are "vertically integrated" and "function[ ] as a single enterprise with unified management and personnel policies."  Id. ¶ 98.  It claims that all of the defendants, "often acting through E&M Bronx and/or Galil, had the power to hire and fire [employees], supervised and controlled [employees'] work schedules and conditions of employment, determined the rate and method of paying [employees] and maintained [employees'] employment records."  Id. ¶ 305.

    C.  Facts from Plaintiffs' Declarations

        1.  Superintendent Plaintiffs

Contrera, Lopez, and Batista all worked as superintendents at buildings on the 600 block of West 160th Street in Manhattan: Contrera at 655 West 160th Street, and Lopez and Batista at

638 West 160th Street.  See Contrera Decl. ¶ 2; Lopez Decl. ¶ 2; Batista Decl. ¶ 5.  Contrera

worked in this role from 2005 through July 1, 2015, Contrera Decl. ¶ 2; Lopez from March 1995

through April 2014, Lopez Decl. ¶ 2; and Batista from January 2015 through March 2016,

Batista Decl. ¶ 5.  Lopez and Batista say their supervisor was Ephraim Weiss, or "Effi," who

described 638 West 160th Street's owners as "E&M" when the building was sold to Weiss's

employers in 2013.  Lopez Decl. ¶¶ 6, 8-9; Batista Decl. ¶ 24.  Their paychecks were issued by

"StaffPro Inc." and "StaffE&M."  Lopez Decl. ¶ 7; Batista Decl. ¶ 25.[2]  Contrera and Lopez's

employment identification cards were marked "E&M Associates."  Usvaldo Contrera ID Card

(attached as Ex. A to Contrera Decl.); Lopez Decl. ¶ 9; Francisco Lopez ID Card (attached as

Ex. B to Lopez Decl.).  A termination letter sent to Contrera on July 1, 2015, was on "Galil

Management" letterhead, but sent and signed by "Ephraim Weiss, Property Manager, E & M

Associates, LLC."  Letter from Ephraim Weiss, dated July 1, 2015 (attached as Ex. B to

Contrera Decl.) ("Weiss Letter").

Contrera was paid $400 per week, Lopez $275 per week, and Batista $600 per week

while working as superintendents, regardless of the number of hours they actually worked.

Contrera Decl. ¶ 9; Lopez Decl. ¶¶ 3, 17; Batista Decl. ¶¶ 23, 31.  They all claim that they

worked over 40 hours per week, were required to be on-call at all times in case of emergencies

or tenant requests, and could not take days off.[3]  Contrera Decl. ¶¶ 3-6, 8; Lopez Decl. ¶¶ 3, 15;

Batista Decl. ¶¶ 26-27.  Their duties included removing garbage and recycling from the

---

[2]  Lopez says that, based on conversations "with other E&M maintenance employees," including Contrera, Reyes, and Batista, he is "aware that E&M . . . also paid them through StaffPro Inc. with paystubs listing 'StaffE&M.'"  Lopez Decl. ¶ 7.

[3]  Lopez claims that he took two weeks of vacation per year, but was required to pay for his temporary replacement.  Lopez Decl. ¶ 16.

buildings, cleaning common areas, repairing fixtures and lights and patching drywall, addressing leaks and other plumbing issues, killing rats and mice, monitoring and maintaining the boiler, and shoveling snow. Contrera Decl. ¶¶ 5, 7; Lopez Decl. ¶ 14; Batista Decl. ¶ 26. They were never given an opportunity to report the number of hours they worked, and were not paid overtime. See Contrera Decl. ¶ 9; Lopez Decl. ¶¶ 7, 17; Batista Decl. ¶¶ 10, 31. They were also required to pay for and provide their own tools, such as paint compressors, nail guns, tile cutters, plumbing snakes, drills, and measuring tape. Contrera Decl. ¶ 12; Lopez Decl. ¶¶ 4, 7; Batista Decl. ¶ 32.

Contrera, Lopez, and Batista were supervised by E&M managers based at an office at 975 Walton Avenue, Bronx, New York, where they picked up paychecks, attended meetings, and met other superintendents from buildings in the Bronx and Upper Manhattan. See Contrera Decl. ¶¶ 10-11; Lopez Decl. ¶¶ 18-22; Batista Decl. ¶¶ 28-30. Lopez and Batista recall specific meetings at this office led by "Effi" where they discussed superintendent responsibilities and work duties such as instructions to keep each building free of litter and garbage, to monitor each building's boiler, and to be on-call for tenant requests. Lopez Decl. ¶¶ 18-19; Batista Decl. ¶¶ 28-30. They all estimate that 30-40 superintendents reported to this office, and attest that conversations with these other superintendents showed that they all were subject to similar policies regarding hours worked, rate of pay, and lack of overtime pay. Contrera Decl. ¶¶ 10-11; Lopez Decl. ¶¶ 18, 20-22; Batista Decl. ¶¶ 28-30.

### 2. Porter Plaintiff

Herrera began working as a porter at 655 West 160th Street, where Contrera was the superintendent, in 2013. Herrera Decl. ¶ 2. He occasionally performed porter work at 638 West 160th Street and, at the request of "Effi (who supervised superintendents and porters)," he served

as a temporary superintendent at 638 West 160th Street for two weeks in 2016.  Id. ¶¶ 3-4.  His

pay remained the same regardless of where he worked or what his title was.  See id. ¶ 4.  Herrera

was paid $305.17 per week in 2014 and $313.76 per week in 2015.  Id. ¶¶ 6-7.  He worked about

70 hours per week — from approximately 7:00 a.m. to 8:00 p.m.  Id. ¶ 9.  He assisted Contrera

with various tasks, including "taking out garbage, removing mattresses and other large items,

cleaning the sidewalk, killing rats, helping with apartment repairs, plastering, painting,

refinishing floors, shoveling snow, mopping floors, and cleaning windows."  Id. ¶¶ 2, 8.  He was

never told that he was entitled to receive overtime pay, was never asked to report to anyone the

number of hours he worked, and received the same flat sum each week, "regardless of the

number of hours that [he] worked."  Id. ¶ 5.

        3.  Handymen Plaintiffs

Batista and Reyes were employed as handymen by enterprises known as "E&M" and

"Galil" and performed repairs and renovations at apartment buildings in Upper Manhattan and

the Bronx.  Batista Decl. ¶¶ 2-3; Reyes Decl. ¶¶ 2, 4.  Batista worked as a handyman from April

2014 to approximately January 2015, Batista Decl. ¶¶ 3, 5, and Reyes worked as a handyman

from 2012 until March 2016, Reyes Decl. ¶ 2.  Each was hired by a manager named Melendez

Medina, who supervised a team of handymen who performed repairs and renovations at "E&M

buildings."  Batista Decl ¶¶ 3, 13; Reyes Decl ¶¶ 3, 11.  Batista and Reyes state that Medina's

boss was defendant Meyer Brecher.  See Batista Decl. ¶¶ 12-13; Reyes Decl. ¶¶ 3, 11.  Their

paychecks from 2013 onwards were issued by "StaffPro, Inc.," with the name "StaffE&M"

printed at the bottom of each paystub.  Batista Decl. ¶ 8; Reyes Decl. ¶ 6; see also Antonio

Reyes Paystub, dated Aug. 8, 2014 (attached as Ex. B to Reyes Decl.).[4]  While working, they

were each required to wear an identification card that bore the name "Galil Management LLC."

Batista Decl. ¶ 2; Reyes Decl. ¶ 7; see also Pedro Batista ID Card (attached as Ex. A to Batista

Decl.).

Batista was paid $600 per week for 40 hours of work as a handyman, and Reyes was paid

$500 per week for the same hours.  See Batista Decl ¶¶ 18, 22; Reyes Decl. ¶ 14; Antonio Reyes

Paystub, dated Aug. 8, 2014 (attached as Ex. B to Reyes Decl.).  Each attests that they were

required to report to "E&M's offices" at 975 Walton Avenue in the Bronx no later than 7:30 a.m.

each work morning, in order to receive deliveries and speak with Medina.  Batista Decl. ¶¶ 13-

15, 18; Reyes Decl. ¶¶ 4, 11-14.  From there they would be dispatched to apartment buildings in

Upper Manhattan and the Bronx.  Batista Decl. ¶ 15; Reyes Decl. ¶ 4.  They would sign in each

morning, but would not sign out when they finished work that evening, generally after 5:30 p.m.

Batista Decl. ¶¶ 14, 18; Reyes Decl. ¶¶ 14-15, 17.  They were never asked how many hours they

worked, never had a chance to report overtime hours, and were never paid for overtime despite

regularly working over 40 hours per week.  Batista Decl. ¶¶ 14, 17-18, 22; Reyes Decl. ¶¶ 14-18.

Additionally, Batista and Reyes were required to provide their own work tools, such as drills,

hammers, trowels, saws, screwdrivers, chisels, and tape measures.  Batista Decl. ¶¶ 19-21; Reyes

Decl. ¶ 20.

Batista and Reyes state that they worked with approximately 30 other handymen who

---

[4]  Reyes avers that "LGL2 Bronx Portfolio LLC," "LGLS Bronx Portfolio LLC," and
"Bronx Platinum Portfolio LLC" issued him his paychecks for the first three years of his
employment, with the paystubs listing the address as 1465A Flatbush Ave, Brooklyn, NY, and
the phone number as (718) 434-9440.  Reyes Decl. ¶ 5.  He says that he knows these as "the
main office and telephone number of E&M."  Id.  He states that beginning in 2013, his
paychecks and paystubs were issued to him by "StaffPro, Inc," and "StaffE&M."  Id. ¶ 6.

were all subject to the same policies and treatment they were.  Batista Decl. ¶¶ 14, 18-20; Reyes

Decl. ¶¶ 13-15, 18, 21.  Reyes specifically refers to the fact that he had conversations with other

handymen who stated they were not paid for all hours worked, Reyes Decl. ¶ 18, and Batista

says that "[his] coworkers told [him] that E&M did not pay overtime," Batista Decl. ¶ 14.

    D.  <u>Other Evidence Submitted by Plaintiffs</u>

The record includes excerpts from deposition transcripts of Ginzberg and Brecher in

another lawsuit.  <u>See</u> Transcript Excerpts, Deposition of Aryeh Ginzberg, dated Jan. 27, 2016,

<u>Fortune Society, Inc. v. Sandcastle Towers Hous. Dev. Fund Corp.</u>, No. 14 Civ. 6410 (E.D.N.Y.)

(attached as Ex. 7 to Am. Compl.) ("Ginzberg Dep."); Transcript Excerpts, Deposition of Meyer

Brecher, dated Nov. 18, 2015, <u>Fortune Society, Inc. v. Sandcastle Towers Hous. Dev. Fund</u>

<u>Corp.</u>, No. 14 Civ. 6410 (E.D.N.Y.) (attached as Ex. 5 to Declaration of Marc A. Rapaport, filed

Nov. 2, 2016 (Docket # 91)) ("Brecher Dep.").  Ginzberg explains in the deposition that there are

many individuals who work for "some E&M associated entity," but several hundred of them are

"officially under StaffPro" — E&M's payroll company — "even though they really work for our

company." <u>Id.</u> at 52-53.

The amended complaint also attaches two memoranda on StaffPro letterhead from

"StaffE&M" explaining employee work schedules, overtime rules, break rules, and how to

record hours worked.  <u>See</u> Memoranda from Staff E&M, dated Dec. 4, 2012 (attached as Ex. 6 to

Am. Compl.) ("StaffE&M Memoranda").  Also attached is a document that was supplied to the

New York State Division of Human Rights in response to an age discrimination complaint from

plaintiff Lopez.  <u>See</u> Letter from Jillian N. Bittner, dated Aug. 12, 2014 (attached as Ex. 1 to

Am. Compl.) ("Bittner Letter").  This document contains a list of "all superintendents employed

at any other premises managed by [E&M Bronx Associates LLC] . . . from April 2012 to April

2014." Id. at 1.  Approximately 250 names are listed, although the letter indicates that "[t]he name of an individual superintendent may appear multiple times due to employment at multiple premises," id. at 2, and there is no indication on the list of the locations of their places of work.

Another document is a management agreement between "E&M Bronx Associates LLC" and entities listed as "Portfolio Owner" and "Deed Holders" for buildings in Upper Manhattan. See Management Agreement (attached as Ex. 2 to Am. Compl.).  There are additionally other documents, diagrams, and statements purporting to show how Ginzberg, Langer, and Lederman "exercise[ ] ownership and control" over those buildings.  See Harlem Portfolio Ownership Diagram (attached as Ex. 3 to Am. Compl.); Affirmation of Irving Langer, Georgia Malone & Co. v. E & M Assocs., No. 1506660/2014 (Sup. Ct. Mar. 17, 2016) (attached as Ex. 4 to Am. Compl.); Guaranty (attached as Ex. 5 to Am. Compl.).

## II.  APPLICABLE LEGAL PRINCIPLES

The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202(a).  Section 216(b) of the FLSA provides, in pertinent part:

> An action to recover . . . liability . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Id. § 216(b).  While the statute does not prescribe any procedures for approval of collective actions, section 216(b) has long been construed to grant authority to a district court to mandate that notice be given to potential plaintiffs informing them of the option to join the suit.  See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 169 (1989) ("[D]istrict courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to

potential plaintiffs."); Braunstein v. E. Photographic Labs., Inc., 600 F.2d 335, 336 (2d Cir. 1978) (per curiam) ("Although one might read the [FLSA], by deliberate omission, as not providing for notice, . . . it makes more sense, in light of the 'opt-in' provision of § 16(b) of the Act, 29 U.S.C. § 216(b), to read the statute as permitting, rather than prohibiting, notice in an appropriate case."). Orders authorizing notice are sometimes referred to as orders "certifying" a collective action, even though the FLSA does not contain a certification mechanism. Myers v. Hertz Corp., 624 F.3d 537, 555 n.10 (2d Cir. 2010). Where a court refers to "certifying" a collective action, however, it means only that the court has exercised its discretionary power "to facilitate the sending of notice" to similarly situated individuals. Id. The approval of a collective action thus amounts to a "'case management' tool for district courts to employ in 'appropriate cases.'" Id. (quoting Hoffmann-La Roche, 493 U.S. at 169, 174).

The requirements of Rule 23 of the Federal Rules of Civil Procedure do not apply to the approval of a collective action. Young v. Cooper Cameron Corp., 229 F.R.D. 50, 54 (S.D.N.Y. 2005); see also Genesis Healthcare Corp. v. Symczyk, 133 S. Ct. 1523, 1532 (2013) ("Whatever significance 'conditional certification' may have in § 216(b) proceedings, it is not tantamount to class certification under Rule 23."). Accordingly, "no showing of numerosity, typicality, commonality, and representativeness need be made." Bittencourt v. Ferrara Bakery & Café Inc., 310 F.R.D. 106, 111 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting Young, 229 F.R.D. at 54). Furthermore, "while a class under Rule 23 includes all unnamed members who fall within the class definition, the 'sole consequence of conditional certification [under § 216] is the sending of court-approved written notice to employees . . . who in turn become parties to a collective action only by filing written consent with the court.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1043 (2016) (alteration and omission in original) (quoting Genesis

10

Healthcare Corp, 133 S. Ct. at 1530).

The Second Circuit has endorsed a "two-step process" for approval of an FLSA collective action:

> At step one, the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law. [Myers,] 624 F.[3]d at 555. At step two, with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs. Id.

Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 540 (2d Cir. 2015). Thus, "[t]he threshold issue in deciding whether to authorize class notice in an FLSA action is whether plaintiffs have demonstrated that potential class members are 'similarly situated.'" Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (quoting 29 U.S.C. § 216(b)).

"Neither the FLSA nor its implementing regulations define the term 'similarly situated.' However, courts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." Id. (citing cases); accord Myers, 624 F.3d at 555; Garcia v. Spectrum of Creations Inc., 102 F. Supp. 3d 541, 547 (S.D.N.Y. 2015). In other words, at this preliminary stage, the focus of the inquiry "is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated." Young, 229 F.R.D. at 54 (citation omitted); accord Garcia, 102 F. Supp. 3d at 547. While only a "modest factual showing" is required, the burden on a plaintiff "is not non-existent and the factual showing, even if modest, must still be based on some substance." Guillen v. Marshalls of MA, Inc., 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010).

"At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." Myers, 624 F.3d at 555; accord Juarez v. 449 Rest., Inc., 29 F. Supp. 3d 363, 369 (S.D.N.Y. 2014).

III. ANALYSIS

Plaintiffs request that the Court approve the text and permit the circulation of a notice of the pendency of this action to all superintendents, porters, and handymen employed by the defendants from six years before plaintiffs filed their complaint to the present date. Pls. Mem. at 2-3. We address the scope of this proposed collective action first, then address plaintiffs' request that the Court approve the text of their proposed notice, see id. at 2; Notice of Lawsuit with Opportunity to Join (attached as Ex. 13 to Rapaport Decl.) ("Proposed Notice"), and that the statute of limitations be tolled for any individual who joins the lawsuit in the future, see Pls. Mem. at 3.

A.  Conditional Certification of Collective Action

Plaintiffs define the class of potential opt-in plaintiffs as superintendents, porters, and handymen currently or previously employed at "the E&M Enterprise's buildings." Pls. Mem. at 2. To support their claim that defendants all operate as one "enterprise," plaintiffs point to the evidence described above and argue that it demonstrates common ownership of "the E&M Enterprise's constituent entities." Id. at 15-17. They also argue that this evidence shows that the wage and hour policies applicable to plaintiffs applied to all of the handymen, superintendents, and porters employed by defendants. See id. at 17-21; Miller Letter at 3-4. Defendants counter that plaintiffs are improperly using an "integrated enterprise" theory to identify their "employer" for FLSA purposes. Defs. Mem. at 3-9; Hampton Letter at 2-5. Additionally, they argue that the

12

plaintiffs only demonstrate personal knowledge of wage and hour polices for 638 and 655 West

160th Street, and of the actions of a single supervisor who had limited responsibilities.[5]  Defs.

Mem. at 9-15.[6]

We begin by addressing whether plaintiffs have shown that the persons they seek to have

notified are employed by the same person or entity that employs plaintiffs.  We then consider

whether the plaintiffs have shown that they are similarly situated to all superintendents, porters,

and handymen employed by this person or entity.

### 1.  Common Ownership or Management

In addressing defendants' argument regarding the plaintiffs' employers, we are mindful

of the fact that in "evaluating whether court-authorized notice is appropriate, the court does not

resolve factual disputes, decide ultimate issues on the merits, or make credibility

determinations."  Diaz v. S & H Bondi's Dep't Store, 2012 WL 137460, at *3 (S.D.N.Y. Jan. 18,

2012) (internal quotation marks omitted) (quoting Davis v. Abercrombie & Fitch Co., 2008 WL

4702840, at *9 (S.D.N.Y. Oct. 23, 2008)).  Additionally, "whether a particular defendant can be

considered a plaintiff's 'employer' is a fact-specific inquiry" that cannot be resolved at this

stage.  Li v. Ichiro Sushi, Inc., 2016 WL 1271068, at *6 (S.D.N.Y. Mar. 29, 2016) (emphasis and

internal quotation marks omitted) (quoting Perez v. Westchester Foreign Autos, Inc., 2013 WL

749497, at *7 (S.D.N.Y. Feb. 28, 2013)).

We thus disagree with defendants that "[w]hether Plaintiffs may proceed . . . using an

---

[5]  Defendants identify the "Effi" named in plaintiffs' declarations as Ephraim Weiss.
Defs. Mem. at 2 n.5.  They claim that Weiss managed approximately 25 buildings, including 638
and 655 West 160th St.  Id. at 14 n.21.

[6]  Defendants' previous objection that no named plaintiffs are handymen, see Defs. Mem.
at 17-20, is now moot because the amended complaint includes two handymen.

'integrated enterprise' theory is a primary, threshold issue" and that "the scope and breadth of

the putative collective is dependent upon resolving this 'joint' employer issue."  Hampton Letter

at 2.  The test for conditional certification does not ask a court to definitively resolve who may

be the plaintiffs' employer or what policies that employer has instituted.  Instead, it asks

"whether the plaintiffs have made an adequate factual showing to support an inference that . . . a

uniform policy or practice exists, and whether the locations share common ownership or

management."  Cruz v. Ham N Eggery Inc., 2016 WL 4186967, at *3 (E.D.N.Y. Aug. 8, 2016)

(ellipsis in original) (internal quotation marks omitted) (quoting Garcia v. Four Bros. Pizza, Inc.,

2014 WL 2211958, at *5 (S.D.N.Y. May 23, 2014)); accord Hamadou v. Hess Corp., 915 F.

Supp. 2d 651, 662 (S.D.N.Y. 2013).  Thus, our ruling will not determine whether all defendants

are in fact employers of plaintiffs.  See, e.g., Lindberg v. UHS of Lakeside, LLC, 761 F. Supp.

2d 752, 763 n.14 (W.D. Tenn. 2011) (declining to decide integrated enterprise question when

considering conditional certification of an FLSA collective action, observing that "[t]he

standards are different," and that "Defendants['] arguments are better suited to a motion for

summary judgment or a motion for decertification").

      "When there are ambiguities in the papers seeking collective action status, the court must

draw all inferences in favor of the plaintiff at the preliminary certification stage."  Jeong Woo

Kim v. 511 E. 5th St., LLC, 985 F. Supp. 2d 439, 446 (S.D.N.Y. 2013) (citations, brackets, and

internal quotation marks omitted).  Reading all inferences in favor of plaintiffs, we find that they

have met their burden of showing that one or more of the defendants was their employer, and

that these defendants are employers of superintendents, handymen, and porters at the buildings

plaintiffs have identified.  Defendant Brecher — in a sworn deposition in a separate case —

testified that "Galil" and "E&M" are owned by the same people, and "run" several hundred

14

buildings principally owned by Ginzberg, Langer, and Lederman.  <u>See</u> Brecher Dep. at 56, 58.

As for plaintiffs, Lopez, Batista, and Reyes each declared that they receive their paychecks from

"StaffPro" and "StaffE&M," <u>see</u> Batista Decl. ¶ 8; Reyes Decl. ¶ 6; Lopez Decl. ¶ 7 —

notwithstanding the fact that they worked at many different buildings.[7]  Ginzberg previously

testified that many employees of E&M Associates are "officially under StaffPro, even though

they really work for our company" — apparently referring to E&M.  Ginzberg Dep. at 52.  He

further explained that E&M employees "officially work[ ] for StaffPro . . . .  But E&M is . . .

managing the company that makes those decisions to hire and to fire," and that if someone were

fired, "StaffPro would then send a termination letter," but "[t]he decision-making comes from

E&M."  <u>Id.</u> at 127.  Memoranda from "StaffE&M" and "Management" on StaffPro letterhead

explain the work schedules and overtime policies for "employees of StaffE&M."  <u>See</u> StaffE&M

Memoranda.  This evidence easily meets plaintiffs' modest burden at the conditional

certification stage to demonstrate that one or more of the defendants commonly own and manage

E&M and thus commonly own or manage all the buildings in the E&M portfolio as well as

manage all the employees of those buildings.

### 2.  <u>Uniform Practice or Policy</u>

Having established that one or more of the defendants manage or supervise all the

employees of E&M, the next question is whether plaintiffs have shown that all superintendents,

---

[7]  As further explanation, Lopez's declaration also includes a letter drafted by defendant
E&M Bronx Associates LLC's attorney as part of Lopez's New York State Division of Human
Rights case, which states that "[E&M Bronx Associates LLC] first retained this payroll company
(Staff Pro LLC) to handle the payroll with respect to all Superintendents employed at premises
that it manages as of January 1, 2013."  Bittner Letter at 2.

handymen, and porters employed by the "E&M enterprise" are similarly situated to plaintiffs with respect to their allegations regarding overtime and other FLSA violations.

While not every case under section 216(b) may be neatly sorted into categories, case law points to two broad methods by which a plaintiff may show he or she is "similarly situated" to the group of employees to whom he or she seeks to send notice of a lawsuit.  One is a "top-down" method of proof, in which a plaintiff provides evidence from a central office or from management levels of an employer showing that the employer had a policy or practice of treating all employees in the class similarly with respect to the allegedly illegal labor law practice.  For example, in Hoffmann v. Sbarro, Inc., 982 F. Supp. 249 (S.D.N.Y. 1997), a class of managers of Sbarro obtained conditional approval of a collective action based in part on evidence that Sbarro had a company-wide policy of improperly requiring restaurant managers to reimburse the company for cash shortages and other losses.  See id. at 261; see also Barbato v. Knightsbridge Props., 2015 WL 5884134, at *4 (S.D.N.Y. Oct. 8, 2015) (uniform policy of not paying overtime established where employer had stated "[a]ll employees are exempt [from overtime]"); Pippins v. KPMG LLP, 2012 WL 19379, at *9-10 (S.D.N.Y. Jan. 3, 2012) (all Audit Associates at accounting firm were "similarly situated" as to its overtime exemption policy "in that they are constrained by uniform, explicit, and unvarying rules" as to their conduct, based on firm policy and professional rules).

The other form of proof may be called "bottom-up" — that is, where plaintiffs and sometimes other employees provide affidavits conveying their own experience with the employer, or recount conversations with other employees, and then seek to draw an inference that an illegal policy or practice exists that covered a group of employees broader than the plaintiff or the other employees who provided the affidavits.  Thus, in Fernandez v. Sharp

16

Management Corp., 2016 WL 5940918 (S.D.N.Y. Oct. 13, 2016), two building superintendents in Manhattan filed affidavits giving information about other employees who suffered illegal treatment in the same manner as the superintendents claimed they did.  Id. at *1, *3.  The court granted conditional approval for superintendents in Manhattan, but denied approval as to other categories of defendants' employees and to those who worked outside of Manhattan, finding that "the Plaintiffs' evidence provides the Court with no objective criteria for determining whether [defendant] has a 'common plan or policy' with regard to any job title except their own," and that "[t]here is no evidence in the record that plaintiffs had any interaction with or personal knowledge of the salary structure of any employees outside Manhattan or that [defendant] applied uniform salary practices across its entire operations."  Id. at *3-5; see also Islam v. BYO Co. (USA), 2017 WL 2693717, at *6 (S.D.N.Y. June 20, 2017) (denying conditional certification where plaintiffs' declarations "contain[ed] no non-conclusory allegations demonstrating that they [had] knowledge of how" other employees of defendants were paid).  We note that the "bottom-up" method does not require multiple affidavits.  Even "a single affidavit providing some basis for an inference that a company-wide policy exists could be sufficient to grant conditional certification."  Fernandez, 2016 WL 5940918, at *3 (collecting cases).

Plaintiffs here make both kinds of arguments.  With respect to their "top-down" arguments, see Pls. Mem. at 11-12, 14-16; Pls. Reply at 6-7; Miller Letter at 3-4, plaintiffs have not shown that the owners, managers, or operators of the "E&M Enterprise" had instituted a city-wide practice or policy of not paying its superintendents, porters, or handymen overtime.  In fact, some of their documentary evidence suggests the opposite.  The memoranda from StaffE&M generally forbid employees from working greater than 40 hours per week or 9 ½ hours per day, and required that employees record and submit their time worked on timesheets.  See StaffE&M

17

Memoranda.  The other documents attached to plaintiffs' declarations do not indicate that a

uniform policy or practice across the "E&M Enterprise" of violating labor laws existed.  See,

e.g., Antonio Reyes Pay Stub, dated Aug. 8, 2014 (attached as Ex. B to Reyes Decl.) (showing

regular rate of $12.50 and overtime rate of $18.75, with payment for 40 hours worked).  The

plaintiffs supply no other evidence as to policies or practices instituted by the management levels

of the "E&M Enterprise" regarding non-payment of overtime or any of the other violations

challenged here.

We next examine the plaintiffs' sworn declarations to see if they provide sufficient

evidence from the "bottom-up" perspective to find that plaintiffs are similarly situated to the

class of employees to whom they seek to have notice sent.

a.  Superintendents

Contrera, Lopez, and Batista all declare that they worked as superintendents at 655 or

638 West 160th Street, performed substantially similar tasks, and were paid a flat salary despite

working well over 40 hours per week.  Contrera Decl. ¶¶ 2-9, 11; Lopez Decl. ¶¶ 2-3, 13-17;

Batista Decl. ¶¶ 5, 23-27, 31.  They were issued identification cards that read "E&M Associates

LLC" or "Galil Management LLC."  Contrera Decl. ¶ 13; Lopez Decl. ¶ 9; Batista Decl. ¶ 2; see

also Usvaldo Contrera ID Card (attached as Ex. A to Contrera Decl.); Francisco Lopez ID Card

(attached as Ex. B to Lopez Decl.); Pedro Batista ID Card (attached as Ex. A to Batista Decl.).

They each were supervised by "Effi" — Ephraim Weiss.  Lopez Decl. ¶¶ 3, 8, 13; Batista Decl.

¶¶ 29-30.[8]  They each reported to the same office at 975 Walton Avenue in the Bronx to receive

_____

[8]  Although Contrera did not declare that he was supervised by "Effi," the letter
terminating his employment was signed by Weiss.  See Weiss Letter.  Lopez additionally says
that "[b]ased on my conversations with [Contrera] . . . he was also supervised by Ephraim
Goldstein [sic]."  Lopez Decl. ¶ 13.

their paychecks and to attend meetings led by Weiss regarding their work responsibilities. Contrera Decl. ¶ 10; Lopez Decl. ¶¶ 18-22; Batista Decl. ¶¶ 24, 28-30.  Contrera and Lopez said they would have conversations at the 975 Walton Avenue office with other superintendents from the Bronx and Upper Manhattan who went there to pick up their paychecks, and who also complained about the large number of hours they worked, the low pay, and the lack of overtime pay.  Contrera Decl. ¶¶ 10-11; Lopez Decl. ¶¶ 21-22.

The fact that these individuals were employed at the same two buildings, worked for the same supervisor, regularly visited the same management office operating under the same corporate name, and were denied overtime wages despite working over 40 hours per week, easily allows the inference that there was a policy or practice at these two buildings of not paying overtime.  See, e.g., Yap v. Mooncake Foods, Inc., 146 F. Supp. 3d 552, 562 (S.D.N.Y. 2015) (testimony that deliveryman was paid below minimum wage, had to sign a book certifying that he received minimum wage, and that book "listed the names of all deliverymen from all locations" allowed Court to infer uniform policy of violations across four restaurants) (internal quotation marks omitted); Barbato, 2015 WL 5884134, at *4 (plaintiffs' declarations that they were not paid overtime, knew of other superintendents who were treated similarly, and were told by an officer at Knightsbridge that "all superintendents . . . [were] not entitled to any compensation for overtime" sufficient to establish common policy existed at all Knightsbridge properties) (internal quotation marks omitted).

The declarations also satisfy plaintiffs' modest burden of showing that this policy applied to superintendents supervised from the office at 975 Walton Avenue.  Contrera and Lopez aver that they met other superintendents at the 975 Walton Avenue office each week when they collected their paychecks there, and that the other superintendents they met also complained

about not receiving overtime pay.  Contrera Decl. ¶¶ 10-11; Lopez Decl. ¶¶ 21-22.  Plaintiffs

testify that they shared the same manager, who called meetings at this office to discuss the work

obligations of superintendents, including those who did not work at their buildings.  See Lopez

Decl. ¶¶ 18-20; Batista Decl. ¶¶ 28-30.  Thus, the plaintiffs' declarations as to their

conversations with these employees provide evidence of a uniform policy affecting all

superintendents who reported to the 975 Walton Avenue office in the Bronx, and meets their

modest burden of showing that these other superintendents are "similarly situated" to them.

     The cases defendants cite do not counsel otherwise.  For example, in Vasquez v. Vitamin

Shoppe Industries, Inc., 2011 WL 2693712 (S.D.N.Y. July 11, 2011), the plaintiff sought to

conditionally certify a nationwide class of employees based on his observations of specific

individuals at locations in Brooklyn and Manhattan.  Id. at*3.  Notably, even though nationwide

notice was denied, conditional certification "with respect to [persons] employed at the seven

retail stores" in Brooklyn and Manhattan identified in the plaintiff's declaration was granted.  Id.

at *5.  The court in Fernandez similarly denied conditional certification to potential plaintiffs

outside of Manhattan because there was "no evidence in the record that plaintiffs had any

interaction with or personal knowledge of the salary structure of any employees outside

Manhattan."  Fernandez, 2016 WL 5940918, at *5.  The declarations in this case present

evidence of such interactions between Contrera, Lopez, and Batista, and potential opt-in

plaintiffs in Manhattan and the Bronx.  In Ikikhueme v. CulinArt, Inc., 2013 WL 2395020

(S.D.N.Y. June 13, 2013), the plaintiff was the only sous chef at a single location, and made only

one unsupported assertion regarding other sous chefs employed by defendants, and none

concerning his predecessors or successors in the position.  Id. at *2-3.  Here, plaintiffs'

declarations provide much more detail.  Finally, in Rudd v. T.L. Cannon Corp., 2011 WL

20

831446 (N.D.N.Y. Jan. 4, 2011), the plaintiffs asserted a host of disparate labor law violations and were ultimately "unable to identify any unlawful policy or practice applied systemically throughout defendants' many restaurant operations." Id. at *8-9.  Plaintiffs' claims are thus distinguishable.[9]

Defendants argue that plaintiffs have at most shown that individuals supervised by Weiss were subject to common policies on overtime.  See Defs. Mem. at 2 n.5; Hampton Letter at 7. There is no evidence in the record, however, that Weiss was the only supervisor of superintendents at the Bronx management office, or that he was responsible for all of the superintendents who received their paychecks from that office.[10]  There is evidence, however, that multiple superintendents reported to the same office as plaintiffs and had verified to plaintiffs that they were experiencing the same overtime violations.  See Contrera Decl. ¶ 10; Lopez Decl. ¶¶ 20-22.  This evidence supports approving notice to a broader class of individuals.

---

[9]  In Laroque v. Domino's Pizza, LLC, 557 F. Supp. 2d 346 (E.D.N.Y. 2008), the court granted approval as to defendants' store in Coney Island, but not their other stores in Brooklyn, due to a lack of factual support.  Id. at 355-56.  The Court did so by making determinations as to the credibility of plaintiffs' declarations and by comparing their testimony to defendants' testimony.  Id. at 356.  Case law dictates, however, that at this stage "the court does not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations."  E.g. Diaz, 2012 WL 137460, at *3 (citations and internal quotation marks omitted); see also Schaefer v. M & T Bank Corp., 122 F. Supp. 3d 189, 196 (S.D.N.Y. 2015) (refusing to resolve which description of the employees' job duties was "accurate" at conditional certification stage).  Thus, we do not view Laroque as persuasive.

[10]  On a similar point, although plaintiffs claim that "the putative collective for superintendents and porters must be limited to the . . . Manhattanville Portfolio," Hampton Letter at 7 n.10, the evidence in the record does not show that the wage and hour policies applicable to these buildings did not also apply to other buildings in Upper Manhattan and the Bronx owned and operated by defendants, or that the "Manhattanville Portfolio" is the limit of defendants' holdings in that area.  In other words, there may be superintendents and porters in Upper Manhattan and the Bronx similarly situated to plaintiffs at properties outside of the "Manhattanville Portfolio."

See, e.g., Colon v. Major Perry St. Corp., 2013 WL 3328223, at *6-7 (S.D.N.Y. July 2, 2013) (approving notice to superintendents employed by defendants at different buildings on basis of three affidavits indicating superintendents were not paid overtime).

Defendants briefly argue that we should exclude buildings that are unionized or are subject to "prevailing wage" contracts from any class. See Defs. Mem. at 14-15 (citing Declaration of Scott Katz, dated Sept. 19, 2016 (attached as Ex. D to Declaration of Larry R. Martinez, filed Sept. 23, 2016 (Docket # 42)). But the mere fact that contracts exist regarding payment of wages at some buildings does nothing to show that the wage violations identified in plaintiffs' declarations do not exist at such buildings as well.

We agree with defendants, however, that plaintiffs have not shown that they are similarly situated to superintendents who work or worked at properties outside of Upper Manhattan and the Bronx. See Hampton Letter at 6-7. No declarant worked at a building outside of these two areas or claims to have information from employees of defendants outside these areas. Although plaintiffs argue that the "E&M Enterprise" maintains common, city-wide payroll policies, they do not present evidence that lets us infer a city-wide policy to not pay superintendents overtime. Our case is thus distinguishable from those like Rosario v. Valentine Ave. Discount Store, Co., 828 F. Supp. 2d 508, 517 (E.D.N.Y. 2011), where declarations established that payroll was controlled and centrally managed across defendants' stores and that plaintiffs were transferred from one store to the other with no change in minimum wage or overtime policies.

22

We are sympathetic to plaintiffs' argument that they may be entitled to certain inferences because "specific information about the E&M Enterprise's multi-entity corporate structure is uniquely within Defendants' knowledge," Pls. Reply at 7, and defendants have declined to provide a full explanation of the ownership of their buildings. We have therefore already accepted plaintiffs' argument that one or more of the defendants may be deemed the employer of all employees of the buildings owned by E&M. However, even where businesses have common ownership, an FLSA plaintiff still must make a showing that employees at all locations were subject to the same illegal policies before a class may be approved consisting of all employees at all locations. See, e.g., Hamadou, 915 F. Supp. 2d at 667 (conditionally certifying class of employees at Hess gas stations in Queens and Bronx, but not state- or nation-wide, because "the allegations only reach as far as the management of the territories encompassing the Queens and Bronx stations" and "[n]othing in the record suggests that similar failures" extended to other territories); Guillen, 750 F. Supp. 2d at 478 (finding that store manager's evidence provided "virtually no basis on which to conclude" that he was similarly situated to all store managers nationwide).

The case of Siewmungal v. Nelson Management Group Ltd., 2012 WL 715973 (E.D.N.Y. Mar. 3, 2012), is not to the contrary because in that case there was evidence of centralized policy and management control imposed by the defendants from a single management office. See id. at *1, *3. In another case cited by plaintiffs, Cruz, plaintiffs showed that two separate food-preparation locations actually "share[d] employees, ingredients and materials" between the two locations. 2016 WL 4186967, at *1. No plaintiff here has alleged that he worked at a building that they claim was managed by any office other than the one in the Bronx. Thus, for example, while plaintiffs assert that Reyes has "personal experience working at

23

more than 50 different apartment buildings," Pls. Reply at 6 (citing Reyes Decl. ¶ 8), Reyes
never claims that any of those buildings were supervised by other offices.

Accordingly, the Court will authorize notice to all superintendents who were supervised
or managed by agents of the defendants who operated out of 975 Walton Avenue, Bronx, New
York.

### b. Porters

Unlike the superintendent plaintiffs, Herrera does not allege that he had any
conversations with other porters about their pay or their work schedule, or ever had to visit the
975 Walton Avenue, Bronx, office.  Rather, Herrera claims that he worked with Contrera at 655
West 160th Street and occasionally at 638 West 160th Street, was supervised by "Effi," never
received overtime pay despite working an average of 70 hours per week, and performed similar
tasks to what the superintendents did, such as taking out garbage, removing mattresses, killing
rats, and helping with repairs.  See Herrera Decl. ¶¶ 2-5, 8-9.

If this testimony was presented alone, it would fail to show that other employees are
"similarly situated" to Herrera.  When considered with the evidence presented as to the
superintendents, however, we reach a different conclusion.  "In the Second Circuit, courts
routinely find employees similarly situated despite not occupying the same positions or
performing the same job functions and in the same locations, provided that they are subject to a
common unlawful policy or practice."  Guaman v. 5 M Corp., 2013 WL 5745905, at *4
(S.D.N.Y. Oct. 23, 2013) (citations and internal quotation marks omitted); accord Rojas v.
Kalesmeno Corp., 2017 WL 3085340, at *4 (S.D.N.Y. July 19, 2017) (collecting cases).
According to Herrera's declaration, he performed substantially the same duties as the
superintendent plaintiffs, worked at the same buildings in Upper Manhattan, reported to a

24

supervisor who supervised superintendents and porters at 975 Walton Avenue in the Bronx, and was not paid for overtime work despite working well over 40 hours per week.  Herrera Decl. ¶¶ 2-5, 8-9; see Lopez Decl. ¶¶ 18-19; Batista Decl. ¶¶ 28-30.  These allegations are enough to show that Herrera and other porters were "similarly situated," for purposes of the FLSA, to the superintendents who were supervised from that office.

Accordingly, notice is authorized as to all porters who were supervised or managed by agents of the defendants who operated out of 975 Walton Avenue, Bronx, New York.

### c. Handymen

Two named plaintiffs — Batista and Reyes — worked as handymen for enterprises called "E&M" or "Galil."  Batista Decl. ¶ 2; Reyes Decl. ¶ 2.  Batista started as a handyman in about April 2014, Batista Decl. ¶ 2, and Reyes in approximately 2012, Reyes Decl. ¶ 2.  They were both initially hired by Melendez Medina, who reported to "Mayer," who Reyes believed was in charge of building maintenance and construction for E&M.  Batista Decl. ¶ 3; Reyes Decl. ¶ 3. They reported to "E&M's management office" at 975 Walton Avenue in the Bronx at 7:30 a.m. each morning, and were dispatched from there to perform repair work at various buildings in Upper Manhattan and the Bronx.  Batista Decl. ¶¶ 15, 18; Reyes Decl. ¶¶ 4, 11, 13-15.  They generally worked until 5:30 p.m.  Batista Decl. ¶ 18; Reyes Decl. ¶ 15.  Despite working 45 hours per week, they were only ever paid for eight hours of work per day, 40 hours per week. Batista Decl. ¶ 18; Reyes Decl. ¶¶ 14-18.  They each worked with a team of about 30 handymen. Batista Decl. ¶ 14; Reyes Decl. ¶ 13.  Reyes avers that based on his conversations with other E&M handymen, he learned that "other handymen who worked for E&M also were not paid anything for the extra hours that we worked."  Reyes Decl. ¶ 18.

25

This evidence, in combination with other evidence regarding superintendents, is sufficient to establish that a group of handymen were "similarly situated" to these plaintiffs such that notice of a potential collective action is warranted.  See, e.g., Fernandez, 2016 WL 5940918, at *4-5; Colon, 2013 WL 3328223, at *6.  However, plaintiffs present no evidence concerning any handyman employed by defendants outside of the Bronx or Upper Manhattan.  Thus, the conditional collective action should be limited to those employees supervised by the E&M office at 975 Walton Avenue in the Bronx.

Accordingly, notice is authorized as to all handymen who were supervised or managed by agents of the defendants who operated out of 975 Walton Avenue, Bronx, New York.

B.  Form of Notice

"Upon authorizing the distribution of notice to potential opt-in plaintiffs, the district court maintains 'broad discretion' over the form and content of the notice."  Martin v. Sprint/united Mgmt. Co., 2016 WL 30334, at *15 (S.D.N.Y. Jan. 4, 2016) (internal quotation marks omitted) (quoting Chhab v. Darden Rest., Inc., 2013 WL 5308004, at *15 (S.D.N.Y. Sept. 20, 2013)).  "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.  Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed."  Hoffmann-La Roche Inc, 493 U.S. at 171.  With this in mind, when determining the particulars of the notice, courts are "guided by the goals of the notice: to make as many potential plaintiffs as possible aware of this action and their right to opt in without devolving into a fishing expedition or imposing undue burdens on the defendants."  Elmajdoub v. MDO Dev. Corp., 2013 WL 6620685, at *4 (S.D.N.Y. Dec. 11, 2013) (internal quotation marks omitted) (quoting Guzelgurgenli v. Prime Time Specials, Inc., 883 F. Supp. 2d 340, 356 (E.D.N.Y. 2012)).

26

Plaintiffs include a proposed notice with their motion papers, see Proposed Notice, but it now must be revised both to reflect new claims in the amended complaint and the rulings in this Opinion.  Accordingly, the Court directs the parties to discuss the proposed notice and to bring any disputes to the Court's attention by letter as promptly as possible.  The one dispute that can be addressed now is the question of whether notice should be provided to individuals who worked for defendants within the last three years — the maximum limitations period under the FLSA, see 29 U.S.C. § 255(a) — as defendants propose, or whether it should given to individuals who worked for defendants within the last six years — the limitations period for claims under the New York Labor Law, see N.Y. Labor Law § 198(3) — as plaintiffs propose. See Defs. Mem. at 21-22; Pls. Mem. at 22-23.

> Courts have selected both time periods.  One case summarizes the split as follows:
>
> The courts that have approved six-year notice periods have cited the economy of providing notice to plaintiffs with FLSA claims who may also have NYLL claims subject to a six-year statute of limitations.  See, e.g., [Winfield v. Citibank, N.A., 843 F.Supp.2d 397, 410-11 (S.D.N.Y. 2012)]; [Schwerdtfeger v. Demarchelier Mgmt., Inc., 2011 WL 2207517, at *6 (S.D.N.Y. June 6, 2011)]; [Klimchak v. Cardrona, Inc., 2011 WL 1120463, at *7 (E.D.N.Y. Mar. 24, 2011)].  By contrast, the courts that have approved three-year notification windows have cited the confusion caused by notifying plaintiffs who potentially have two disparate claims with different statutes of limitations, along with the inefficiency of providing notice to plaintiffs whose claims may well be time-barred.  See[,] e.g., Hamadou, 915 F. Supp. 2d at 667-68; [Lujan v. Cabana Mgmt., Inc., 2011 WL 317984, at *9 (E.D.N.Y. Feb. 1, 2011)]; [McBeth v. Gabrielli Truck Sales, Ltd., 768 F. Supp. 2d 396, 400 (E.D.N.Y. 2011)].

Trinidad v. Pret a Manger (USA) Ltd., 962 F. Supp. 2d 545, 564 (S.D.N.Y. 2013).

As Trinidad notes, there is the potential for "confusion caused by notifying plaintiffs who potentially have two disparate claims with different statutes of limitations" as well as "inefficiency" in "providing notice to plaintiffs whose claims may well be time-barred."  Id.; accord Rojas, 2017 WL 3085340, at *6 ("The three-year period more effectively serves the goal

of efficiency in this case and will avoid confusing individuals whose claims arise only under the NYLL . . . ."); Ramos v. PJJK Rest. Corp., 2016 WL 1106373, at *5 (S.D.N.Y. Mar. 10, 2016) (only approving notice for three years prior to filing of complaint, as the plaintiffs "[did] not explain how efficiency or judicial economy are enhanced if the collective action notice includes a six-year limitations period for NYLL claims that have not received class certification").

In the present case, we believe that "the three-year period more effectively serves the goal of efficiency . . . and will avoid confusing individuals whose claims arise only under the NYLL . . . ." Rojas, 2017 WL 3085340, at *6.

C. Tolling

Plaintiffs' motion in this case centers on the notice that plaintiffs seek to have sent to current and former employees of defendants. But plaintiffs also request that the Court rule that the statute of limitations be tolled for opt-in plaintiffs from the date of the filing of the complaint or, at the latest, the date the instant motion was filed. See Pls. Mem. at 23-25. The limitations period for FLSA claims is at most three years. See 29 U.S.C. § 255(a). If the limitations period is not so tolled, opt-in plaintiffs would not be able to make claims for any period prior to three years from the date they actually file a consent to join the action. See 29 U.S.C. § 256(b) (limitations period is measured from date plaintiff joins an FLSA lawsuit); Yahraes v. Rest. Assocs. Events Corp., 2011 WL 844963, at *1 (E.D.N.Y. Mar. 8, 2011) ("the limitations periods in a FLSA action continues to run until an individual affirmatively opts into the action.").

1. Law Governing Equitable Tolling

The doctrine of equitable tolling allows a court to extend a statute of limitations "on a case-by-case basis to prevent inequity." Warren v. Garvin, 219 F.3d 111, 113 (2d Cir.), cert. denied, 531 U.S. 968 (2000). "Equitable tolling applies as a matter of fairness where a party has

been prevented in some extraordinary way from exercising his rights." Iavorski v. I.N.S., 232 F.3d 124, 129 (2d. Cir. 2000) (internal quotation marks and alterations omitted).

The Supreme Court has made clear, however, that the conditions for applying the doctrine are strict. "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); accord Lawrence v. Florida, 549 U.S. 327, 336 (2007) (noting that the extraordinary circumstance must have "prevented timely filing"); Bolarinwa v. Williams, 593 F.3d 226, 231 (2d Cir. 2010); Zerilli-Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 80-81 (2d Cir. 2003); Estate of Mandarino v. Mandarino, 699 F. Supp. 2d 646, 652 (S.D.N.Y. 2010), aff'd, 408 F. App'x 428 (2d Cir. 2011). The second prong of the equitable tolling test "is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control." Menominee Indian Tribe of Wis. v. United States, 136 S. Ct. 750, 756 (2016) (emphasis omitted).

The Second Circuit has repeatedly cautioned that "equitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances." A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135, 144 (2d Cir. 2011) (internal quotation marks and alterations omitted); accord Phillips v. Generations Family Health Ctr., 723 F.3d 144, 150 (2d Cir. 2013) (quoting A.Q.C. ex rel. Castillo, 656 F.3d at 144); Bertin v. United States, 478 F.3d 489, 494 n.3 (2d Cir. 2007) (quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam)). Thus, "[w]hen a movant does not provide any grounds showing equitable tolling may be appropriate, it will not be applied." Mark v. Gawker Media LLC, 2014 WL 5557489, at *2 (S.D.N.Y. Nov. 3, 2004) (citing Ouedraogo v. A-1 Int'l Courier Serv., Inc., 2013 WL 3466810, at *4 (S.D.N.Y.

July 8, 2013)).

       2.  Whether Potential Opt-In Plaintiffs Have Shown Entitlement to Equitable Tolling

Here, plaintiffs have failed to establish the first prong of the equitable tolling doctrine. Plaintiffs provide no facts or even arguments regarding existing or potential opt-in plaintiffs that reflect that these employees of the defendants have been "pursuing [their] rights diligently." Lawrence, 549 U.S. at 336. As noted by another court in this district in denying equitable tolling in an FLSA suit, the equitable tolling inquiry is "a highly factual issue that depends on what and when a plaintiff knew or should have known — an inquiry that is simply impossible to conduct when opt-in plaintiffs and the facts specific to them have not yet been revealed." Alvarado Balderramo v. Taxi Tours Inc., 2017 WL 2533508, at *5 (S.D.N.Y. June 9, 2017); see also Hintergerger v. Catholic Health Sys., 2009 WL 3464134, at *15 (W.D.N.Y. Oct. 21, 2009) (denying equitable tolling because "[p]laintiffs here have offered no allegations or proof from which this Court can conclude that a reasonably prudent potential plaintiff would not have known of his or her right to receive overtime pay after 40 hours"). The plaintiffs on whose behalf equitable tolling is being sought have not been identified. Although plaintiffs conclusorily allege that many of the potential collective members do not speak English and may be unaware of their rights under the FLSA, see Pls. Mem. at 24, no specific information has been provided about any particular opt-in plaintiff's circumstances. Thus, this Court cannot assess whether any potential opt-in plaintiff has diligently pursued his or her rights.

We are aware that some courts in this district have assessed the actual (or "named") plaintiff's diligence when granting equitable tolling in this context. See Flood v. Carlson Rests. Inc., 2015 WL 260436, at *6 (S.D.N.Y. Jan. 20, 2015) (granting equitable tolling for opt-in

plaintiffs "in light of Plaintiffs' diligence in pursuing the FLSA claims on behalf of putative opt-ins"); McGlone v. Contract Callers, Inc., 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012) (granting equitable tolling for opt-in plaintiffs because "those whose putative class representatives and their counsel are diligently and timely pursuing the claims should [] not be penalized due to the courts' heavy dockets and understandable delays in rulings").  However, the test for equitable tolling is not concerned with the diligence of a plaintiff who has already timely filed a claim, but rather with the diligence of a plaintiff who is seeking the application of the doctrine.  As the Second Circuit has formulated the rule, "when determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply."  Zerilli-Edelglass, 333 F.3d at 80–81 (emphasis added) (internal quotation marks and citations omitted).

        In their brief, plaintiffs cite to McGlone, 867 F. Supp. 2d at 445, which held that the time period spent by a court deciding a motion for conditional approval may by itself allow for the application of the equitable tolling doctrine.  See Pls. Mem. at 24.  McGlone ruled that "the delay caused by the time required for a court to rule on a motion" for conditional approval of a collective action "may be deemed an extraordinary circumstance justifying" equitably tolling the statute of limitations.  867 F. Supp. 2d at 445 (quoting Yahraes, 2011 WL 844963, at *2) (internal quotations marks omitted).  Indeed, other cases have similarly ruled.  See, e.g., Viriri v. White Plains Hosp. Med. Ctr., – F.R.D. –, 2017 WL 2473252, at *1, *8-9 (S.D.N.Y. June 8, 2017); Varghese v. JP Morgan Chase & Co., 2016 WL 4718413, at *10-11 (S.D.N.Y. Sept. 9, 2016); Tubiak v. Nielsen Co. (U.S.), LLC, 2016 WL 796861, at *4 (S.D.N.Y. Feb. 25, 2016);

Reyes v. N.Y. F&B Serv. LLC, 2016 WL 796859, at *5 (S.D.N.Y. Feb. 22, 2016).[11]

These cases, however, do not conform to the equitable tolling doctrine as described by the Supreme Court and the Second Circuit. Some of the cases provide no reasoned argument as to why the equitable tolling doctrine applies but simply cite to other cases that allowed for delays in adjudicating a motion to support equitable tolling. See Reyes, 2016 WL 796859, at *5; Colon, 2013 WL 3328223, at *8. Others characterize the period of time taken to decide the motion for conditional approval as "extraordinary" and use that delay alone as a basis for finding equitable tolling. See Viriri, 2017 WL 2473252, at *8-9; Varghese, 2016 WL 4718413, at *10-11. We do not find these cases persuasive because by focusing exclusively on the time it took the court to decide the conditional approval motion, none make a finding that the opt-in plaintiffs for whom tolling is sought acted diligently in pursuing their rights. Thus, putting aside the question of whether a court's delay could qualify as "extraordinary" under the second prong of the equitable tolling test, we do not see how these decisions square with Pace, 544 U.S. at 418, Lawrence, 549 U.S. at 336, and numerous other Supreme Court cases that require a showing of diligence by a litigant seeking to toll a statute of limitations.

In sum, we have no basis for making a ruling at this time that any current or future opt-in employees' claims must be equitably tolled given that there has been no showing that they have met the "diligence" prong of the equitable tolling doctrine. Thus, we need not reach the second prong of the equitable tolling doctrine. See, e.g., Hintergerger, 2009 WL 3464134, at *15

---

[11] Other courts have found a delay in resolving a particular motion too brief to be considered "extraordinary" and have refused to equitably toll the statute of limitations on that basis. See Vasto v. Credico (USA) LLC, 2016 WL 2658172, at *16 (S.D.N.Y. May 5, 2016) (less than five months); Guzman v. Three Amigos SJL, Inc., 117 F. Supp. 3d 516, 527-28 (S.D.N.Y. 2015) (three and a half months); Mark, 2014 WL 5557489, at *2-3 (11 months).

(denying equitable tolling because no showing had been made on the "dilligence" of the potential opt-in plaintiffs); see also Pace, 544 U.S. at 418 (denying equitable tolling because "petitioner's lack of diligence precludes equity's operation.")

We are certainly aware that this approach means that some employees of defendants will not be entitled to pursue potentially meritorious wage claims under the FLSA. But the enforcement of any statute of limitations results in meritorious claims going uncompensated. More to the point, even courts of equity "must be governed by rules and precedents no less than the courts of law." Lonchar v. Thomas, 517 U.S. 314, 323 (1996) (internal quotation marks omitted). Because governing precedent does not permit equitable tolling here, plaintiffs' application for a categorical ruling tolling the statute of limitations for all opt-in plaintiffs is denied. This ruling is without prejudice to any application by a plaintiff for equitable tolling that conforms to the requirements of the equitable tolling doctrine.

Of course, some plaintiffs who receive notice will have claims that pre-date the three-year period depending on how long they worked for defendants. Thus, after any such plaintiffs have opted in, these plaintiffs will be free to make equitable tolling arguments. We are aware that one court has criticized a procedure under which a court allows applications for tolling on an individualized basis rather than making a categorical equitable tolling ruling. See Jackson v. Bloomberg, L.P., 298 F.R.D. 152 (S.D.N.Y. 2014). Jackson characterized such a process as a "piecemeal approach to equitable tolling, which would waste judicial resources, further delay resolution of this action, and contravene the purposes of FLSA" and granted equitable tolling categorically based on the delay in deciding the motion for conditional approval. Id. at 171. We respectfully disagree with Jackson. While adjudicating equitable tolling for plaintiffs after they join an FLSA action certainly consumes judicial resources and may create delay, it is a necessary

result of the law governing equitable tolling, which has strict rules that limit its application.  For good or ill, the application of the equitable tolling standard is "'highly case-specific,' and the 'burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." Wilder v. U.S. Dep't of Veterans Affairs, 175 F. Supp. 3d 82, 90 (S.D.N.Y. 2016).  As to Jackson's view that such a process "contravene[s] the purposes of FLSA," we note that, while Congress could have instituted a statutory scheme under which opt-in FLSA plaintiffs benefit from the filing date of the original plaintiff (similar to the regime that governs class actions under Fed. R. Civ. P. 23), Congress did not do so.  Instead, the FLSA explicitly measures the statute of limitations from the date an opt-in plaintiff joins the lawsuit, and limits an employer's exposure to three years worth of claims.  See 29 U.S.C. §§ 255(a), 256.  Thus, one of the purposes of the FLSA is to protect employers from suits that accrue more than three years before that date.  Finally, we note that the expenditure of judicial resources to adjudicate such claims may be limited to the extent that opt-in plaintiffs share common circumstances that may allow for an equitable tolling ruling that governs plaintiffs sharing those circumstances.

    3.  Whether Notice Should be Sent to Former Employees Who Ended Their Employment With Defendants  More Than 3 Years Prior to the Date the Notice Is Mailed

That the Court cannot grant equitable tolling at this stage of the case, however, does not end our inquiry.  This is because plaintiffs are seeking to have the notice period calculated based on the date the complaint was filed, see Pls. Mem. at 22-23, and presumably would be prepared to have the entitlement of any future opt-in plaintiffs to equitable tolling be decided at a later stage of the case.  In other words, plaintiffs would seek to have the notice sent to employees whose employment with defendants ended more than three years ago on the theory that one or more of these employees might qualify for equitable tolling were they to make the requisite

34

showing once they joined the lawsuit.  Under this scenario, notice would be sent to all employees in this case who worked for defendants three years prior to the filing of the lawsuit or the filing of this motion and the Court would determine later whether equitable tolling would be permitted for any of the employees who later join the lawsuit.  Courts authorizing notice under this logic note that while they will not toll the statute of limitations before providing notice to potential opt-in plaintiffs, they will send out notice to the wider group of employees and permit "challenges to the timeliness of individual plaintiffs' actions . . . at a later date."  See Martin, 2016 WL 30334, at *16 (quoting Trinidad, 962 F. Supp. 2d at 564 n.14); accord Lopez v. JVA Indus., Inc., 2015 WL 5052575, at *6 (S.D.N.Y. Aug. 27, 2015); Guzman, 117 F. Supp. 3d at 528; She Jian Guo v. Tommy's Sushi Inc., 2014 WL 5314822, at *6 (S.D.N.Y. Oct. 16, 2014).

The question then becomes under what conditions should notice be sent to employees whose employment ended before the start of the three-year limitations period.  Some courts have permitted notice to a wider group of employees simply on the theory that "equitable tolling issues often arise for prospective plaintiffs" in FLSA suits.  Winfield, 843 F. Supp. 2d at 410; accord Gomez v. Terri Vegetarian LLC, 2017 WL 2628880, at *2 (S.D.N.Y. June 16, 2017); Alves v. Affiliated Home Care of Putnam, Inc., 2017 WL 511836, at *5 (S.D.N.Y. Feb. 8, 2017); Bittencourt, 310 F.R.D. at 116-17; Fonseca v. Dircksen & Talleyrand Inc., 2014 WL 1487279, at *4 (S.D.N.Y. Apr. 11, 2014); Hamadou, 915 F. Supp. 2d at 668.  In other words, these courts do not require any presentation of facts that would show the potential for equitable tolling.  Rather, the fact that "equitable tolling issues often arise" in other FLSA actions is sufficient to send notice to the larger group.

We disagree with these cases, however, to the extent they do not conduct an analysis of the potential for equitable tolling in the particular case at hand.  As the Second Circuit has noted,

35

equitable tolling is expected to occur in only "rare" circumstances, Phillips, 723 F.3d at 150, and must be considered on a "case-by-case basis," Warren, 219 F.3d at 113.  Thus we cannot follow a rule that simply assumes that equitable tolling will be routinely available in all FLSA cases. See generally Wallace v. Kato, 549 U.S. 384, 396 (2007) ("Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs").  A court's "discretionary power to facilitate the sending of notice to potential class members is premised on its use as a tool for efficient case management."  Trindad, 962 F. Supp. 2d at 556 (citing Hoffman-LaRoche, 493 U.S. at 169, 174; Myers, 624 F.3d at 555 n.10).  But sending notice to potential opt-in plaintiffs with obviously time-barred claims and no explanation as to why they may be able to demonstrate equitable tolling in the future fails to serve this purpose.[12]

We agree, rather, with those courts that have conducted some inquiry into whether there are particular circumstances suggesting that potential plaintiffs might actually succeed in demonstrating entitlement to equitable tolling.  See, e.g., Gaspar v. Pers. Touch Moving, Inc., 2014 WL 4593944, at *7 (S.D.N.Y. Sept. 15, 2014) (allowing notice to be sent to potential opt-in plaintiffs whose claims accrued within three years prior to the date the complaint was filed because "[d]efendants did not post the workplace notices that the FLSA requires").  Where there is at least a realistic possibility that individuals whose employment fell outside the limitations period may be able to show equitable tolling, notice to such individuals is appropriate.  Where, however, plaintiffs have made no showing of the potential for equitable tolling, expanding the

---

[12]  We are also concerned that an individual who receives notice that he may join litigation justifiably believes that he has a realistic potential to recover money.  It seems unfair to raise such hopes if the suit is time-barred and there is no basis for concluding that the employee will overcome that bar.  It also may unnecessarily subject such individuals to potential burdens of participating in the litigation of a time-barred claim.

notice period is unjustified.  See Cordova v. SCCF, Inc., 2014 WL 3512820, at *6 (S.D.N.Y.

July 16, 2014) (because plaintiffs failed to make "a sufficient showing of rare and exceptional

circumstances . . . . the Court declines to toll the statute of limitations, and so notice will be

limited to individuals who were delivery persons within three years from the date the Court

issues an order approving the proposed notice.") (citation omitted); Ouedraogo, 2013 WL

3466810, at *4 ("because Plaintiff has failed to provide any grounds to support his argument that

equitable tolling is or may be appropriate in this case, the notice period will be for the three year

period prior to the filing of the notice, not the complaint").

       In this case, plaintiffs have not shown that there is a realistic possibility that any

individuals whose employment fell outside the limitations period will be able to demonstrate

equitable tolling.  Plaintiffs briefly note that potential opt-in plaintiffs are likely unaware of their

rights under the FLSA, and that this ignorance is exacerbated by the possibility that many may

not speak English.  See Pls. Mem. at 24.  However, in the cases cite by plaintiffs, the courts

pointed to factual circumstances in addition to the plaintiff's own lack of knowledge or language

facility.  See Kone v. Joy Constr. Corp., 2016 WL 866349, at *3 (S.D.N.Y. Mar. 3, 2016) (noting

that "Defendants intentionally failed to comply with their obligations to provide plaintiffs with

notice as to their legal rights") (internal quotation marks and alterations omitted); United States

v. Sabhnani, 566 F. Supp. 2d 139, 146 (E.D.N.Y. 2008), aff'd in part, vacated in part, 599 F.3d

215 (2d. Cir. 2010) (noting the lack of notice in the workplace).  This is consistent with case law

holding that ignorance of the law and language barriers are normally insufficient to permit

equitable tolling.  Hengjin Sun v. China 1221, Inc., 2015 WL 5542919, at *7 (S.D.N.Y. Aug. 12,

2015) ("Although Plaintiffs assert that they are poor immigrant workers who do not speak

English, the law is clear that lack of education, limited financial means, and ignorance of the law

are not extraordinary circumstances that justify equitable tolling") (citation omitted); see also

Ormiston v. Nelson, 117 F.3d 69, 72 n.5 (2d Cir. 1997) ("Mere ignorance of the law is, of

course, insufficient to delay the accrual of the statute of limitations").  Assuming arguendo that

an employer's failure to post a statutorily required notice might justify equitable tolling, no such

failure has been shown here.

     In sum, because plaintiffs have not shown a realistic possibility that employees whose

employment ended outside the limitations period will be able to demonstrate equitable tolling,

notice will be sent only to individuals who were last employed by defendants within three years

prior to the date the notices are mailed.

IV.  CONCLUSION

     For the foregoing reasons, plaintiffs' motion for conditional approval of a collective

action (Docket # 104) is granted in part and denied in part as set forth herein.

     SO ORDERED.

Dated:     New York, New York
          October 5, 2017

GABRIEL W. GORENSTEIN
United States Magistrate Judge